929 F.2d 910
 136 L.R.R.M. (BNA) 2977, 59 USLW 2627,
118 Lab.Cas. P 10,672
 The ASSOCIATED GENERAL CONTRACTORS OF CONNECTICUT, INC. and
International Association of Bridge, Structural and
Ornamental Ironworkers, Local No. 15, AFL-CIO, Petitioners
(90-4065, 90-4085) and Cross-Respondents (90-4109, 90-4111),
v.
NATIONAL LABOR RELATIONS BOARD, Respondent (90-4065,
90-4085) and Cross-Petitioner (90-4109, 90-4111).
NATIONAL LABOR RELATIONS BOARD, Petitioner (90-4101),
v.
NORTHERN DISTRICT OF CONNECTICUT IRONWORKERS LOCAL NO. 15,
JOINT APPRENTICESHIP COMMITTEE, Respondent (90-4101).
 Nos. 697, 698, 728, 729, 1059, Dockets 90-4065, 90-4085,
90-4101, 90-4109, 90-4111.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 4, 1990.
Decided April 4, 1991.
 
 Michael N. La Velle, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for petitioner/cross-respondent Associated General Contractors of Connecticut.
 Burton S. Rosenberg, New Haven, Conn., for petitioner/cross-respondent Local No. 15 and for respondent Joint Apprenticeship Committee.
 Marilyn O'Rourke, Washington, D.C. (Jerry M. Hunter, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Howard E. Perlstein, of counsel), for cross-petitioner/respondent/petitioner N.L.R.B.
 Wm. Bradford Reynolds, Thomas G. Olp, Ross & Hardies, Michael E. Kennedy, Washington, D.C., for amicus curiae Associated General Contractors of America, Inc.
 Before WINTER, Circuit Judge,* and DALY, District Judge.**
 WINTER, Circuit Judge:
 
 
 1
 This case involves a supplemental compliance proceeding before the National Labor Relations Board ("Board"). The question is whether the Board, in such a proceeding, may impose backpay liability on an employers' association and a local union for an unfair labor practice committed by a joint labor-management apprenticeship committee. The Board ruled that the employers' association and the local union had, through their respective representatives on the apprenticeship committee, caused the unlawful discharge of the committee's training coordinator and were therefore vicariously liable for the backpay award against their agent, the committee.
 
 
 2
 Although various agency doctrines may be invoked in unfair labor practice proceedings, derivative liability may be imposed in a supplemental compliance proceeding only on the more demanding showing of an alter ego, successor, or single employer status. No such showing was made here as to the employers' association. Such a showing may have been made as to the local union, but the Board's findings in this regard are unclear. Accordingly, the employers' association's petition for review is granted, and the cross-applications for enforcement are denied. We remand the local union's petition for review to the Board to consider whether the union may be found liable under the proper standard for derivative liability.
 
 BACKGROUND
 
 3
 The Associated General Contractors of Connecticut, Inc. ("AGC") is a trade association that provides a variety of services to its members, including representation in collective bargaining. In this capacity, AGC negotiates collective bargaining agreements covering ironworkers in Connecticut that are signed by AGC and also by various non-AGC employers who individually agree to their terms. The unions involved in the instant matter are the International Association of Bridge, Structural and Ornamental Ironworkers, Local No. 15 ("union" or "Local 15"), and Ironworkers Local No. 424 ("Local 424").
 
 
 4
 In a collective bargaining agreement dated July 1, 1960, the parties agreed to establish joint apprenticeship committees in the jurisdiction of Locals 15 and 424. The committees were initially financed by union contributions and federal funds. However, in 1967, a trust fund, the Iron Workers' Local Nos. 15 and 424 Apprentice Training Trust Fund ("Fund"), was established pursuant to Section 302(c)(5) of the Taft-Hartley Act, 29 U.S.C. Sec. 186(c)(5) (1988). Subsequent collective bargaining agreements provided that employers would contribute to the Fund in amounts based on the number of hours worked by ironworkers they employ.
 
 
 5
 The instant dispute began on July 31, 1984, when the Northern District of Connecticut Ironworkers Local No. 15 Joint Apprenticeship Committee ("JAC") discharged its training coordinator, Bruce Gilbert. Gilbert filed an unfair labor practice charge against the JAC and Local 15. Local 15 was later dropped as a respondent, an act that caused the very considerable extension of these proceedings. The substance of Gilbert's charge was that he had been fired because of his role in political infighting within Local 15, thus violating his rights under 29 U.S.C. Sec. 158(a)(1) and (3).
 
 
 6
 Administrative Law Judge ("ALJ") Lawrence found that Gilbert was discharged because of his union activities and that the JAC's professed concerns about Gilbert's job performance were pretextual. ALJ Lawrence found that there had been a long history of conflict between Gilbert and Lloyd Etkin, then president of Local 15, and that Etkin frequently threatened to remove Gilbert from the training coordinator job. ALJ Lawrence observed that
 
 
 7
 [t]he evidence in the record presents a clear picture of two men, Gilbert and Etkin, on opposite sides politically in union affairs, engaged in periodic battles to secure union office for themselves and those associated with them, and bristling with hostility towards each other. The evidence shows that over the course of a considerable period of time, Etkin made numerous statements to the effect that he would pry Gilbert loose from his job as JAC coordinator and that, in addition, he made statements linking that intention to the fact that Gilbert had worked against him in the Union.
 
 
 8
 Northern District of Connecticut Iron Workers Local Union No. 15, Joint Apprenticeship Committee, 278 N.L.R.B. 914, 917 (1986). ALJ Lawrence further found that Etkin had engineered the decision of the JAC to dismiss Gilbert with the cooperation of JAC chairman Carl Johnson, an employer representative, and two union members of the JAC whom Etkin had appointed in his capacity as president of Local 15. The Board affirmed ALJ Lawrence's findings and adopted his recommended order directing the JAC to reinstate Gilbert with backpay.
 
 
 9
 We enforced the Board's order in an unpublished decision. NLRB v. Northern District of Connecticut Iron Workers Local Union No. 15, The Joint Apprenticeship Committee, 805 F.2d 391 (2d Cir.1986). However, the JAC refused to comply with the order, claiming that it had new grounds for discharging Gilbert. The Board then moved for a summary adjudication of civil contempt. After referring the matter to a district judge for a hearing, report, and recommendation, we found the JAC in contempt of our October 14 order. NLRB v. Northern District of Connecticut Iron Workers Local Union No. 15, The Joint Apprenticeship Committee, Nos. 86-4060, 86-4080 (2d Cir. Mar. 21, 1988). We ordered the JAC to purge itself of contempt within twenty days by, inter alia, reinstating Gilbert with full backpay. We also prohibited the JAC from acting on its new allegations against Gilbert until after it had fully purged itself of the contempt.
 
 
 10
 The JAC refused to comply with the purgation order, and the Board moved for an assessment of fines and issuance of a writ of body attachment against JAC chairman Johnson. On May 2, 1988, in response to the threat of the writ of body attachment, the JAC finally reinstated Gilbert. However, the JAC continued to assert that it lacked funds with which to satisfy the backpay and other costs assessed in the purgation order.
 
 
 11
 On September 15, 1988, implicitly agreeing that the JAC had no means with which to comply with the monetary portions of the purgation order, we ordered the JAC simply to mail, at the Fund's expense, notices concerning the relief and remanded the proceeding to the Board to determine the amount of backpay and to consider whether the Fund, AGC, or Local 15 might be derivatively liable for the backpay award. NLRB v. Northern District of Connecticut Iron Workers Local Union No. 15, Joint Apprenticeship Committee, Nos. 86-4060, 86-4080 (2d Cir. Sept. 15, 1988). On remand, ALJ Snyder ruled that AGC and Local 15 were liable for the backpay due Gilbert. With respect to AGC, ALJ Snyder found that it was a party to the collective bargaining agreement that established the JAC, that it possessed authority to appoint the management members of the JAC, and that it had appointed JAC chairman Johnson, who had in turn recruited other management representatives. With respect to the union, ALJ Snyder found that the Local 15 president had exercised his authority to appoint union members of the JAC. In addition,
 
 
 12
 [Local 15's] secretary performs services for the JAC and until 1984, [Local 15] rented office space to the JAC. Local 15 pays the [training] coordinator, secretary and related expenses and is reimbursed monthly for these expenditures, leading to a comingling of Local 15 and JAC funds. Minutes of JAC monthly meetings are read and the [training] coordinator reports apprenticeship matters at Local 15 general membership meetings.... Gilbert also negotiated a waiver of the job requirement that the [training] coordinator not engage in union political activity with the Local 15 Executive Board rather than with the JAC.
 
 
 13
 ALJ Snyder also noted that Local 15 business agent Dennis Foley had personally presented Gilbert with a layoff slip listing Local 15 as the employer, showing Local 15's employer identification number, and bearing Foley's signature stamp.
 
 
 14
 In finding derivative liability, ALJ Snyder relied on a theory of contractual delegation of authority to the JAC to administer an apprenticeship program for the mutual benefit of Local 15 and AGC. Based on the facts described above, he concluded that AGC and the union were co-principals of the JAC and were therefore vicariously liable for the unlawful discharge of Gilbert. The ALJ also ruled that the Fund could not be held liable for the backpay award because of its status as a Section 302(c)(5) trust fund whose trustees owe an exclusive fiduciary duty to the apprentices enrolled in the apprenticeship program. Gilbert has not petitioned for review of the ruling regarding the Fund's liability, and it is not before us.
 
 
 15
 The Board adopted the ALJ's recommended decision and order with a slight modification to the backpay computation. Northern District of Connecticut Iron Workers Local Union No. 15, Joint Apprenticeship Committee, 298 N.L.R.B. No. 63 (May 7, 1990). The Board also disclaimed any reliance on the theory that Local 15 and AGC were liable simply because they established the JAC. The Board agreed with ALJ Snyder, however, that both Local 15 and AGC "through their separate representatives on [the JAC] not only knew of, but actually effectuated, Gilbert's unlawful discharge." Id., slip op. at 2 n. 2.
 
 DISCUSSION
 
 16
 We first address whether AGC and Local 15 may be found derivatively liable on the basis of an agency relationship with the JAC. Whether a principal may be liable in an unfair labor practice proceeding for the unlawful act of its agent depends on the nature of the agency relationship. See, e.g., Wolf Trap Foundation, 287 N.L.R.B. No. 103 (Jan. 13, 1988) (rejecting strict application of respondeat superior doctrine in favor of considering specific circumstances of agency relationship). In the instant matter, however, liability was imposed in a supplemental compliance proceeding against entities that were not parties to the unfair labor practice proceeding. Although the Board assumed that the same standard applied in each proceeding, the two kinds of proceedings are quite different, and the Board's ruling significantly departed from established doctrine.
 
 
 17
 We have approved the Board's practice of imposing derivative liability on new parties in a supplemental proceeding without commencing a new unfair labor practice proceeding against those parties. NLRB v. C.C.C. Associates, Inc., 306 F.2d 534 (1962). However, the power to impose such liability in a supplemental proceeding depends on the relationship between the party originally held liable and the party to be held derivatively liable. In C.C.C. Associates, we explained that
 
 
 18
 [t]he Board [in a derivative liability proceeding] is not charging the new parties with any unfair labor practice of their own or participation in those of the original respondents; rather, it alleges only that they bear such relationships to parties already determined to be guilty that they share with them the already adjudicated financial obligation to make certain employees whole for lost pay.
 
 
 19
 Id. at 539. Moreover, as the Board itself has observed, derivative liability in a supplemental proceeding may be imposed only if the parties are " 'sufficiently closely related.' " Southeastern Envelope Co., 246 N.L.R.B. 423, 423 (1979) (quoting Coast Delivery Service, Inc., 198 N.L.R.B. 1026, 1027 (1972)).
 
 
 20
 The General Counsel concedes that the Board has never before relied on an agency relationship to impose derivative liability. Prior Board decisions have imposed such liability only on parties that were the alter ego or successor of the originally charged party or where the two parties were found to be a single employer. See, e.g., Southeastern Envelope, 246 N.L.R.B. 423 (alter ego); Coast Delivery Service, Inc., 198 N.L.R.B. 1026 (alter ego); BMD Sportswear Corp., 283 N.L.R.B. 142 (1987) (same); Hopkins Hardware, 271 N.L.R.B. 175 (1984) (successor); Great Race Pizza Shoppes, 277 N.L.R.B. 1175 (1985) (single employer).[1]
 
 
 21
 Relying upon the Board's broad remedial powers, the General Counsel argues that the ALJ's decision, as modified by the Board, was an appropriate exercise of its "wide discretion [to] order[ ] affirmative action" to vindicate the policies of the labor laws. Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 539, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). However, the sole basis for ALJ Snyder's conclusion that a principal may be held derivatively liable for the backpay obligation of its agent is a footnote in Brockway Motor Trucks, 251 N.L.R.B. 29 (1980), consent decree denying enforcement approved, 656 F.2d 32 (3d Cir.1981), in which the Board observed that the General Counsel could litigate the question of a parent corporation's derivative liability during the compliance stage of that proceeding. Id. at 33 n. 19 (citing Southeastern Envelope and Coast Delivery ). The ALJ seized on this footnote as authority for the proposition that the Board has recognized bases for derivative liability other than alter ego, successor, and single employer status.
 
 
 22
 However, the Brockway footnote is dubious authority. First, no compliance proceedings were ever held in that case because an intervening Supreme Court decision eliminated the basis for the original unfair labor practice charge. See Brockway Motor Trucks v. NLRB, 656 F.2d 32, 33 (3d Cir.1981). Second, it is a considerable stretch to conclude that a one-sentence observation in a footnote about the proper procedural vehicle for imposing liability on a parent company was a major expansion of the permissible bases for that liability. Had the Board intended a substantial expansion of derivative liability doctrine, one would have expected some discussion to justify and define the intended expansion instead of a conclusory footnote with the customary citations to Southeastern Envelope and Coast Delivery, both alter ego cases. See supra note 1. Moreover, the Board itself declined to rely on Brockway in the instant matter, relying instead on an analysis that is rather obtuse. Although the Board took pains to disavow reliance on a theory that AGC and Local 15 were liable simply because they established the JAC, it cited only cases involving original unfair labor practice liability. See Morrison-Knudsen Co. v. NLRB, 275 F.2d 914 (2d Cir.1960); Lummus Co. v. NLRB, 339 F.2d 728 (D.C.Cir.1964); Wolf Trap Foundation, supra. Of course, these decisions have no bearing on the proper standard to be applied in a supplemental compliance proceeding.
 
 
 23
 We adhere to the view that derivative liability requires a showing of alter ego, successorship or single employer status. This heightened standard of liability is necessary to guarantee procedural fairness to a non-party to the original unfair labor practice proceeding. The exceedingly close relationship of alter ego, successor, or single employer status provides assurance that the proceeding against the original party was equivalent to a proceeding against the newly added party. In those circumstances, the newly added party has had notice and an opportunity to contest the charge through its control of the original party. As the Board itself has observed, the derivatively liable party can be
 
 
 24
 found liable only after it received fair notice and full opportunity to litigate at the compliance hearing the question of its status as [an] alter ego. Once found to be [an] alter ego, [the newly added party] cannot complain that it should have had notice and an opportunity to defend itself against the underlying unfair labor practice charges. Since the interests of alter egos are by definition identical, the alter ego finding in the compliance proceeding conclusively established that [the newly added party] did receive adequate notice, was present at the hearing, and did defend itself through the representation of [the original respondent] in the earlier unfair labor practice proceeding.
 
 
 25
 Southeastern Envelope, 246 N.L.R.B. at 424. Moreover, although original liability must be based on a timely unfair labor practice charge naming the party to be held liable, see 29 U.S.C. Sec. 160(b) (establishing six-month statute of limitations), derivative liability may be imposed without regard to the fact that the limitations period has expired. It is thus quite important to require a showing of a relationship amounting to substantial identity between the original and newly added parties if the statute of limitations defense is to be rejected.
 
 
 26
 On this record, AGC could not be held liable in either an unfair labor practice or supplemental compliance proceeding. Although the Board singled out AGC, AGC is not the sole employer signatory to the collective agreement and cannot act on behalf of signatory non-AGC employers. Even if liability were based on an agency theory, some showing that AGC rather than some other signatory employer caused Gilbert's discharge would be necessary. Moreover, the ALJ's finding that AGC has power either under the collective agreement or as a matter of custom to appoint employer members to the JAC is clearly erroneous. As the General Counsel's brief concedes, the management members of the JAC have in recent years been a self-perpetuating group, with existing members informally recruiting their own replacements, a number of whom were employed by non-AGC employers. The ALJ also found that AGC appointed JAC chairman Johnson, but that finding too is clearly erroneous. The evidence in the record is that Johnson was recruited by a co-worker at Berlin Steel. Nor is there evidence that AGC at any time removed a management member or attempted to influence a JAC decision. Indeed, the only evidence of contact between AGC and the JAC was an unsuccessful attempt to convince the JAC to rent space in an AGC-owned building. Thus, even if AGC had been charged in the original unfair labor practice proceeding, it could not have been found liable. There is, therefore, no basis whatsoever for holding AGC derivatively liable in a supplemental compliance proceeding.
 
 
 27
 The potential liability of Local 15 is a closer question. Gilbert was discharged as a result of an internal union political dispute with Etkin, who openly vowed to cause the JAC to discharge Gilbert because of that dispute. As president of the union, Etkin appointed the two union members of the JAC, whom he influenced to support Gilbert's discharge. The ALJ also found some entanglement of union and JAC business affairs, including the intermingling of funds and sharing of personnel. The record reveals that a union officer provided Gilbert with his formal layoff notice purporting to be from Local 15 and that Gilbert regarded Local 15 as his employer. Had the charges against the union not been dropped by the General Counsel, we would not have hesitated to enforce a backpay order against Local 15 emanating from the unfair labor practice proceeding. Charges were dropped, however.
 
 
 28
 Nevertheless, the evidence may be sufficient to establish the union's derivative liability under an alter ego or single employer theory. ALJ Snyder found that Etkin's roles as president of Local 15, in which capacity he appointed the labor members of the JAC, and as a member in his own right, enabled him to manipulate the JAC. ALJ Snyder concluded that "the identity of [Local 15] and [the JAC] appeared to merge." Given the evidence of entanglement and commingling of funds, the fact that Etkin's power within the JAC was derived from Local 15, and Local 15's conduct indicating that it viewed itself as Gilbert's employer, the case for finding alter ego or single employer status is thin but viable. Accordingly, we remand the issue of the union's potential liability for further proceedings consistent with this opinion.[2]
 
 
 
 *
 Before argument, Judge Newman recused himself from consideration of this case. Pursuant to this court's Rule Sec. 0.14, the appeal has been heard and decided by Judges Winter and Daly, who constitute a quorum
 
 
 **
 The Honorable T.F. Gilroy Daly of the United States District Court for the District of Connecticut, sitting by designation
 
 
 [1]
 The facts in the two most commonly cited derivative liability cases, Coast Delivery and Southeastern Envelope, demonstrate the dominant role of the alter ego theory in derivative liability doctrine. Coast Delivery involved evidence of common ownership, personnel, equipment and customers. 198 N.L.R.B. 1026, 1028 (1972). Southeastern Envelope involved an employer that had closed operations in one location and reopened several days later in a nearby town with identical equipment, products, customers, employees and ownership. 246 N.L.R.B. 423, 427 (1979)
 
 
 [2]
 The union's argument that the amendment of the initial charge dropping it as a respondent should be accorded res judicata effect is meritless. The General Counsel is free, during the limitations period, to amend a charge to add or remove respondents with proper notice to the parties. But such action "is not a decision on the merits with res judicata effect." United Food and Commercial Workers v. NLRB, 675 F.2d 346, 353 n. 7 (D.C.Cir.1982). Moreover, where the General Counsel is later able to show the identity of interests necessary to alter ego, successor or single employer status, it is immaterial whether the party to be held derivatively liable has also been charged. A party that has never been charged may be held derivatively liable, and we believe that the removal of the union as a party to the original unfair labor practice proceeding should not leave it in a more immunized position than a party that was never charged. There is thus no res judicata bar to imposing derivative liability on Local 15
 Because we are remanding to the Board to reconsider the question of liability, we do not reach the union's contention concerning the amount of backpay due Gilbert.